**In the Matter of the Claim of David J. GJERDAHL, Claimant.**

No. C2-87-430.

Court of Appeals of Minnesota.

Sept. 1, 1987.

Darrold E. Persson, Hibbing, for relator Gjerdahl.

Hubert H. Humphrey, III, Atty. Gen., Peter L. Andrews, Sp. Asst. Atty. Gen., St. Paul, for respondent Com'r of Jobs and Training.

Heard, considered and decided by RANDALL, P.J., and SEDGWICK and LANSING, JJ.

## OPINION

RANDALL, Judge.

A Commissioner's representative from the Department of Jobs and Training determined that David Gjerdahl was ineligible to receive unemployment compensation benefits because he was receiving worker's compensation payments for loss of wages during the same time period. We reverse.

## FACTS

Relator David Gjerdahl began working as a welder for Hibbing Taconite in October 1978. In October 1979 and August 1985, Gjerdahl sustained injuries as a result of occupational accidents, and after the accident in August 1985, he negotiated an agreement with Hibbing Taconite for the payment of worker's compensation. That agreement provided:

7. It is the intention of the parties to effect a full, final and complete settlement of the employee's claims for workers' compensation benefits arising out of his occupational accidents of October 25, 1979, and August 4, 1985. The parties intend to settle on a full, final and complete basis any and all claims for temporary partial, temporary total, permanent total, retraining and/or rehabilitation benefits, whether or not heretofore claimed by the employee with respect to either accident. The employer and self-insurer will continue to pay such medical expenses as may be incurred by the employee and reasonably related to either the October 25, 1979, accident or the August 4, 1985, accident.

\* \* \* \* \* \*

NOW, THEREFORE, in order to compromise and settle this claim, it is hereby stipulated and agreed by and between the parties hereto that the Workers' Compensation Division may enter an award as follows:

1. Directing that the employer and self-insurer pay the employee 156 weeks of temporary total disability benefits from May 19, 1986, through May 14, 1989. Said benefits shall be paid at the rate of $329.00 per week, adjusted on an annual basis as appropriate under the Minnesota Workers' Compensation Act. Said benefits may be paid on a bi-weekly basis.

2. Directing payment by the employer and self-insurer to the employee of the lump sum of $20,000.

3. Specifying that the described settlement shall constitute a full, final and complete settlement of any and all claims for Workers' Compensation benefits that the employee has now or may hereafter have by reason of his occupational injuries of either October 25, 1979, or August 4, 1985, to include any and all claims for temporary total, temporary partial, permanent total, permanent partial, retraining or rehabilitation benefits. (It is specifically agreed that upon approval of this settlement, the employee's QRC services may be, and shall be, terminated.) Further specifying that the employer and self-insurer shall remain responsible for paying all medical expenses incurred by the employee and reasonably related to his occupational injuries of October 25, 1979, and/or August 4, 1985.

A letter from the attorney who drafted the agreement for Hibbing Taconite states that Gjerdahl was to receive the payments under this agreement for 156 weeks even if he returned to work. The attorney testified:

[T]he deal was that we would pay that 156 weeks irrespective of what happened to him and the reason for that was because we weren't negotiating and settling only temporary total disability, we were settling all existing and potential claims arising out of his accident. So it really, it was a device for settling the case. We paid a lump sum and we, in

addition to that, because there's advantages to both parties to doing so, we extended part of the settlement of all those claims over a period of time, three years.

\* \* \* \* \* \*

The attorney also testified that there was no special significance to the figure of $329; it was simply "a means of getting \* \* \* part of the payment spread out over time." He agreed that the payments could have been set at $200 a month or $500 a month, and that Gjerdahl could have received one lump sum up front instead. Gjerdahl testified that he wanted payments spread out over three years because he was afraid he would "blow it" if he received one large payment.

After Gjerdahl negotiated the settlement and was no longer working for Hibbing Taconite, he applied for unemployment compensation benefits. On June 9, 1986, the Department denied his application, explaining:

> The evidence you and your employer have provided to this Department [i.e. the agreement regarding workers compensation] supports a conclusion that you are unable to work. Benefits are hereby denied for the period beginning 5–18–86 and proceeding until the conclusion of your total disability, currently expected to be 5–14–89. \* \* \*

For "Period Affected," the Department filled in: 5–18 to 5–31–86.

Despite this determination, on June 23 Gjerdahl received a check for $228 for the week ending June 14. He did not file a timely appeal from the June 9 order, because he believed he would be receiving unemployment compensation benefits after all.

On July 16, when he received no more checks, Gjerdahl went to the unemployment compensation office to inquire about his payments. At that time, he was informed that the $228 payment had been a mistake, and that he would have to return the money. Instead, Gjerdahl filed an appeal from the order dated June 9. That appeal was filed after the 15–day appeal period had expired, and was therefore untimely.

The next day, Gjerdahl received a written notice in the mail ordering repayment of the $228. On July 23, he filed an appeal from that overpayment decision. That second appeal was timely.

Two hearings were scheduled for August 11, 1986. The notice of the first hearing indicated that Gjerdahl should be prepared to address the issues: (1) whether his appeal from the June 9 order was timely; and (2) whether he was "able" to work. The notice of the second hearing indicated that the overpayment issue would be litigated. Neither notice raised the question of whether Gjerdahl should be precluded from receiving unemployment compensation benefits because he was already receiving worker's compensation payments.

Following the hearings on August 11, the referee issued two decisions, concluding: (1) Gjerdahl's appeal from the determination of June 9 was not timely; (2) the June 9 determination had denied benefits from May 18 "until the conclusion of his total disability"; (3) Gjerdahl had established that his total disability had ceased; but (4) any unemployment compensation benefits should be reduced by worker's compensation payments Gjerdahl was receiving, pursuant to Minn.Stat. § 268.08, subd. 3(3) (1986); and (5) Gjerdahl should refund the $228 as ordered.

Gjerdahl appealed all issues to a Commissioner's representative, who affirmed the repayment question, but remanded for consideration of whether the worker's compensation payments should be deducted from Gjerdahl's compensation benefits. The representative reasoned that Gjerdahl had not previously received proper notification of this issue, and should be given the opportunity to litigate the question.

Upon remand, and after receiving additional testimony, a referee again determined that: (1) Gjerdahl's appeal from the June 9 order was untimely; (2) Gjerdahl was "able" to work; but (3) Gjerdahl's unemployment compensation benefits must be reduced by the worker's compensation

payments he was receiving. On appeal, a Commissioner's representative affirmed.

## ISSUES

1. Did the June 9 order preclude Gjerdahl from receiving unemployment benefits until May 14, 1989?

2. Should Gjerdahl's worker's compensation payments be deducted from the amount of unemployment compensation benefits to which he is entitled?

## ANALYSIS

### I.

#### Appealability

■ The attorney for the Commissioner argues that Gjerdahl's appeal from the June 9 order was untimely, and that Gjerdahl should therefore be bound by that order. He argues Gjerdahl should be denied benefits until May 14, 1989, due to the following language in the order:

Benefits are hereby denied for the period beginning May 18, 1986, and proceeding until the conclusion of your total disability, currently expected to be May 14, 1989.

We disagree, noting that the Commissioner's representative affirmed the following finding by the referee:

From the physician's statement contained in the record, it appears clear that [Gjerdahl] could resume unrestricted full time work as of July 14, 1986. Thus, while the appeal [from the June 9 order] was late, this referee feels that information supplied by [Gjerdahl] at this point indicates that [Gjerdahl] was able to work subsequent to July 14, 1986.

Because Gjerdahl's total disability had ceased by July 14, the June 9 order, by its own terms, no longer precluded his receipt of benefits after July 14.

■ Gjerdahl's second appeal, stemming from the July 17 notice of overpayment, was timely, and raised the issue of his "ability" to work. The referee and Commissioner's representative were therefore correct in addressing this issue.

### II.

#### Eligibility

The Commissioner's representative concluded that although Gjerdahl is "able" to work, he is nevertheless ineligible to receive unemployment compensation benefits by reason of the following statute:

An individual shall not be eligible to receive benefits for any week with respect to which the individual is receiving, has received, or has filed a claim for remuneration in an amount equal to or in excess of the individual's weekly benefit amount in the form of

\*   \*   \*   \*   \*   \*

(3) compensation for loss of wages under the workers' compensation law of this state or any other state or under a similar law of the United States, or under other insurance or fund established and paid for by the employer \* \* \*.

Minn.Stat. § 268.08, subd. 3(3) (1986). The representative concluded that Gjerdahl's worker's compensation payments are for "loss of wages," and that the period for which Gjerdahl has sought unemployment compensation benefits overlaps with the period for which he has received and will receive worker's compensation payments.

#### a. *Loss of Wages*

■ There is substantial evidence in the record to refute the representative's conclusion that the $329 per week was for "loss of wages." First, the written agreement itself does not state that it is intended to be compensation for loss of wages only. Rather, the agreement specifically indicates that it is intended to settle *all* claims except medical payments:

The parties intend to settle on a full, final and complete basis any and all claims for temporary partial, temporary total, permanent total, retraining and/or rehabilitation benefits \* \* \*.

While we recognize that, in part, the agreement was intended to cover loss of wages, there is no proof of which portion of the settlement was specifically intended to cover loss of wages. The agreement

does not state that the $329 per week for three years was limited to temporary total, or that the $20,000 lump sum payment was intended as compensation only for claims other than loss of wages which Gjerdahl gave up.

This uncertainty is amplified by the fact that, while the settlement was intended to compensate Gjerdahl for injuries he received both in 1979 and 1985, the agreement does not explain the intended apportionment of damages for those separate injuries. Although Gjerdahl continued to work after 1979, part of the $329 per week may have been intended as compensation for those 1979 injuries.

The attorney for Hibbing Taconite who drafted the agreement testified that Hibbing Taconite did not assume Gjerdahl would actually lose wages in the amount of $329 per week. He also stated the agreement was a settlement of all potential claims. In fact, there is no evidence in the record indicating that Hibbing Taconite contested Gjerdahl's claim for unemployment compensation benefits.

### b. *Period of Compensation*

■ The evidence reveals that Gjerdahl himself chose to receive his payments over an extended period of time, instead of receiving a lump sum settlement intended as part of the overall compensation package for those 1979 and 1985 injuries and other claims that Gjerdahl released. The attorney for Hibbing Taconite agreed the amount of the weekly payments was an arbitrary figure, not established for any particular reason other than as a means of spreading the settlement over three years. The attorney also stated that Gjerdahl was to receive his payments even if he went back to work. This testimony indicates that the parties simply chose to settle for $71,000,[1] with a portion up front and the rest on a weekly basis—much like a structured settlement in a personal injury case.

We find persuasive the supreme court's analysis in *State, Department of Employment Security v. Zroker*, 280 Minn. 286,

159 N.W.2d 190 (1968). There, the employee worked off and on from 1951 until 1965, receiving unemployment compensation at times when he was laid off. In 1963, a spot was discovered on his lung, and in 1966 a worker's compensation settlement was negotiated. The settlement provided for a lump sum payment of $3000, representing 66 weeks of temporary total disability at $45 per week, plus $597.50 in medical expenses. No particular 66 week period was specified in the settlement, which was characterized as a "full, final and complete settlement of any and all claims, past, present or future, arising out of alleged personal injuries * * *." *Id.*, 159 N.W.2d at 191.

Upon the employee's application for unemployment compensation, a Commissioner's representative determined that Minn. Stat. § 268.08, subd. 3(3) precluded payment of benefits. The employee appealed to the supreme court, which reversed, finding no evidence to establish the payments for worker's compensation and unemployment compensation overlapped or were made for the same period of time. The court found it impossible to determine which percentage of the award applied to the past, and concluded:

> [I]n the absence of proof as to what part, if any, of the workmen's compensation award would apply to the period during which relator was paid unemployment compensation, the statute cannot apply.

*Id.*, 159 N.W.2d at 192. The court stated:

> It appears to us that, so far as the workmen's compensation payments are concerned, relator and his employer's insurer simply settled the case and drew a release which would cover all claims that might arise for this claimed disability, without any determination or specification as to what period of disability it should apply to. On that kind of evidence it simply cannot be found that the compensation payments in whole or in part applied to the period during which relator was paid unemployment compensation. As a matter of fact, he continued

---

1. $329 per week multiplied by 156 weeks (3 years) equals $51,324. That sum, when added to the $20,000 lump sum payment, totals $71,-324.

to work when work was available. Unemployment compensation is based on the assumption that the employee is available for work on the labor market, whereas workmen's compensation is paid on the theory that he is disabled from working.

*Id.* We find this analysis controlling.

Here, also, Gjerdahl and Hibbing Taconite settled all claims in a package settlement and drew a release which contained a breakdown only for the terms of payment. The release did not allocate specific sums to the approximately one half dozen different claims that Gjerdahl had. While the settlement agreement sets up payments on a weekly basis for three years, nevertheless the testimony of the parties reveals their intent was a *"Zroker* intent" because the three-year payments were simply the means of structuring the payments over a period of time. As in *Zroker,* Gjerdahl continues to be available for work in the labor market. Under these circumstances, we cannot sustain the Commissioner's denial of unemployment compensation benefits.

We note the unfairness of penalizing Gjerdahl for accepting this structured settlement instead of a one time lump sum payment of the entire $71,000. The Commissioner concedes that, under its theory of the case, even if Gjerdahl went on to locate another job with another unrelated employer and was subsequently laid off, his present receipt of installment payments until 1989 would preclude him from receiving unemployment compensation benefits until 1989.

The Commissioner also concedes that if Gjerdahl received his $71,000 in a one time lump sum payment, later went to work for another unrelated employer and was subsequently laid off, he would be entitled to receive unemployment compensation benefits. This unequal result, which the Commissioner agrees may look unfair on the surface, but argues is the law, does not comport with the purpose of the unemployment compensation statutes to provide compensation "for the benefit of persons unemployed through no fault of their own." Minn.Stat. § 268.03 (1986).

## DECISION

On these facts, the Commissioner erred by declaring Gjerdahl ineligible for unemployment compensation benefits until 1989. The Commissioner's basis that these, or any benefits to be paid during the next three years, would be impermissible because they would be paid during the same period Gjerdahl continued to receive monies pursuant to the settlement for loss of wages, is not supported by the evidence. The record supports only the conclusion that Gjerdahl received a structured settlement negotiated for all the claims he had. The settlement agreement did not contain, either specifically or by inference, separate monies allotted to each of Gjerdahl's separate claims.

Reversed.